UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY GRISWOLD, as Personal Representative of the Estate of JOHN E. GRISWOLD, | |
| Plaintiff, | Case No. 22-cv-10980 |
| v. | Honorable Robert J. White |
| TRINITY HEALTH-MICHIGAN, et al., | |
| Defendants. | |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE LIVINGSTON COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.    <u>Introduction</u>

Timothy Griswold commenced this 42 U.S.C. § 1983 wrongful death action on behalf of his brother, John Griswold's estate.  The amended complaint alleges that Sheriff Michael J. Murphy, Sergeant Terry Davis, and several jail services deputies exhibited deliberate indifference to John Griswold's serious medical condition while he was incarcerated at the Livingston County jail.  The Estate also asserts that Livingston County failed to train its jail services deputies to appropriately handle inmate medical emergencies.  The Court will refer to

Livingston County and the individual deputies as the "Livingston County Defendants" collectively.

Before the Court is the Livingston County Defendants' motion for summary judgment. (ECF No. 53).  The Estate responded. (ECF No. 77).  The Livingston County Defendants filed a reply. (ECF No. 80).  They also submitted a supplemental brief. (ECF No. 96).  The Court held a hearing on the motion on January 10, 2025. (ECF No. 104).  For the following reasons, the motion is granted in part and denied in part.

II.   <u>Background</u>

   A.   *Factual History*

Just before 2:00 p.m. on October 14, 2018, Brighton, Michigan police officers were dispatched to Griswold's address to investigate a report from his family that he was assaulting them. (ECF 53-2, PageID.845).  Officers found Griswold in the kitchen and they told him he was under arrest.  Family members informed the officers that Griswold "took about 10 pills" from the "large amount" sitting on the kitchen counter. (*Id.*).  He did not know what they were for. (*Id.*).  With Griswold in custody, one of the officers radioed for emergency medical assistance.  Paramedics arrived and "determined that [the pills on the counter] were medication for ulcers." (*Id.*).

2

A dashboard camera depicts the officers escorting Griswold to a patrol vehicle, placing him inside, and driving him to the Livingston County Jail. (ECF No. 53-3, Counter 6:50-7:51, 20:53-42:36).  During the trip, Griswold struggled to keep his head upright, he slurred his speech, and he paused for periods of time between answering the officers' questions about the pills he ingested. (*Id.*, Counter 08:54-23:00).  When the officers transferred him to another vehicle, he informed them he could "hardly walk." (*Id.*, Counter 23:29).

The officers assisted Griswold with exiting the vehicle and walked him to the jail's intake unit around 2:50 P.M. (*Id.*, Counter 43:16-45:44; ECF No. 53-4, Counter 00:48-3:00; ECF No. 53-5, Counter 0:00-0:18; ECF No. 53-7, PageID.853).  The jail nurse checked Griswold's vitals as he slouched in a chair. (ECF No. 53-5, Counter 4:08-8:35).  She observed that Griswold was "pouring sweat," had "pin point pupils" and that he was "not answering medical questions about health needs." (ECF No. 53-7, PageID.853-54).  She advised the officers that Griswold "needed to be transported to the emergency room for clearance." (*Id.*, PageID.854).  The officers lifted Griswold from under his arms, walked him back to the patrol vehicle, and assisted him back inside. (ECF No. 53-5, Counter 8:36-9:19; ECF No. 53-3, Counter 45:56-46:50; ECF No. 53-6, Counter 0:00-1:01).  They transported him to St. Joseph Mercy Livingston Hospital. (ECF No. 53-3, Counter 47:07-51:02; ECF No. 77-4).

At the hospital, Griswold denied feeling any pain, he "follow[ed] commands," spoke "in full sentences," and he did not appear in distress. (ECF No. 77-4, PageID.3293).  Doctors observed that Griswold "may be limited due to probable intoxication or mental status." (*Id.*).  He could not stay awake long enough to provide a urine sample. (ECF No. 53-32, PageID.1172).  Although a CT scan of his face revealed a nasal fracture and his heart rate had decreased, medical evaluation notes indicate that doctors "discharge[d] [him] to police with instructions." (*Id.*, PageID.3295).  The hospital's discharge papers contained a bold-lettered warning that "[s]ignificant changes or worsening in your condition may require more immediate attention." (ECF No. 53-11, PageID.873).  It also cautioned Griswold to "seek immediate medical care" in the event he experienced "recurrent vomiting."[1] (*Id.*, PageID.876).

Officers returned Griswold to the Livingston County Jail around 5:55 P.M. (ECF No. 53-8, Counter 0:01).  An officer assisted him out of the patrol vehicle and he walked tentatively on his own power. (*Id.*, Counter 3:57-4:20).  Griswold stumbled briefly when entering the intake unit. (ECF No. 53-9, Counter 0:28-30).

---

[1] The "recurrent vomiting" warning appeared in the section of the discharge papers related to the nasal fracture. (ECF No. 53-11, PageID.876).  But none of the jail services deputies reviewed the discharge papers anyway. (ECF No. 53-28, PageID.1112, Tr. 29:2-12; ECF No. 77-9, PageID.3409, Tr. 26:25-27:3; ECF No. 77-10, PageID.3485, Tr. 159:14-16; ECF No. 77-12, PageID.3594, Tr. 51:20-23; ECF No. 77-13, PageID.3622, Tr. 54:17-56:3; ECF No. 77-14, PageID.3638, Tr. 9:20-10:13).

He swayed slightly back-and-forth. (*Id.*, Counter 0:41-2:23). He leaned his body on the entrance wall to support himself. (*Id.*, ECF No. 77-10, PageID.3469, Tr. 96:2-14).

Griswold appeared not to respond to two directives from Deputy Travis Linden to face the intake wall and place his hands above his head so the deputy could search him. (ECF No. 53-9, Counter 2:20-3:03; ECF No. 77-10, PageID.3469, Tr. 96:7-10). Deputy Linden pulled him by the arm and placed him next to the wall. (ECF No. 53-9, Counter 3:06-13; ECF No. 77-10, PageID.3469, Tr. 96:11-14). He searched Griswold, handcuffed him, and walked him to an intake cell for observation alongside Deputy Sutfin.[2] (ECF No. 53-9, Counter 3:14-4:59; ECF 53-13, Counter 4:17-54, 6:37-7:08). The two deputies attempted to change Griswold into a suicide vest at Sergeant Davis's instruction. (ECF 53-13, Counter 4:43-54; ECF No. 77-10, PageID.3470, Tr. 97:16-22). They instead left him in his civilian clothes because he was unable to change. (ECF 53-13, Counter 6:37-7:08; ECF No. 77-10, PageID.3470, Tr. 97:16-22).

At 6:06 P.M., Deputies Linden and Sutfin placed Griswold on the floor of an intake cell with his hands cuffed behind back. (ECF No. 53-22, Counter 0:01-24; ECF No. 53-13, Counter 6:54-7:03). He spent the next 13 and a half hours laying

---

[2] Deputy Sutfin's first name does not appear in the record. (ECF No. 77-9, PageID.3412, Tr. 40:11-14).

on the floor of that cell. (ECF Nos. 53-22, 53-23, 53-24).  Aside from the cell inspections that individual deputies performed throughout the night of October 14 and into the morning of October 15 (which the Court will address in more detail below), four subsequent events are worth noting because of their importance.

*Event One* – 7:00 P.M.  Deputies Linden and Partrick Turchi entered the intake cell to remove Griswold's handcuffs. (ECF No. 53-22, Counter 54:41-57:41).  Video footage shows them both placing their hands under each of his arms and standing him upright.  Griswold stumbled as the deputies picked him up off the floor.  He lost his balance, swayed noticeably, and remained hunched over at the waist as Deputy Linden unlocked the handcuffs.  Griswold kept his hands behind his back for some time, not seeming to recognize that Deputy Linden had already removed the handcuffs.  The deputies assisted him back into a seated position on the cell floor since he did not appear capable of sitting down on his own.  Even then, Griswold had difficulty sitting up straight without swaying backwards or slouching forwards.  Nor could he lift his head off his chest as Deputy Linden attempted to converse with him. (*Id.*, Counter 56:22-57:37).

*Event Two* – 7:59 P.M.  Griswold placed his hands to his mouth as he lay on the floor, turned his head left, and projectile vomited green-colored emesis onto his shirt, pants, arms, and the cell floor adjacent to him. (ECF No. 53-22, Counter 1:53:20-53; ECF No. 77-16, PageID.3681).

6

*Event Three* – 7:09 A.M.  Griswold started convulsing.  His legs and arms began twitching. (ECF No. 53-24, Counter 3:09:13-10:13).   Video depicts his breathing becoming more labored as his abdomen distended with each breath. (*Id.*).  His breathing then slowed and appeared to stop altogether at 7:17 A.M. (*Id.*, Counter 3:10:13-16:54).

*Event Four* – 7:42 A.M.  Deputies Vincent John and Kurt Heiob entered the intake cell as Griswold lay motionless on the cell floor. (ECF No. 53-24, Counter 3:41:57-3:44:01).  After failing to detect a pulse with the jail nurse's assistance, they lifted Griswold by his hands and feet and removed him from the intake cell. (*Id.*, Counter 3:43:22-40; ECF No. 23-25, Counter 7:43:25-40).  Deputy John performed CPR. (ECF No. 53-24, Counter 3:43:58-44:01; ECF No. 53-25, Counter 7:43:58-44:02).

Livingston County EMS technicians arrived at 7:50 A.M. (ECF No. 77-16, PageID.3677).  They attempted to resuscitate Griswold unsuccessfully. (ECF *Id.*, PageID.3680).  A physician pronounced him dead at 8:25 A.M. from "sudden cardiac death." (*Id.*; ECF No. 77-17, PageID.3682; ECF No. 77-20, PageID.3863).  Postmortem laboratory work revealed toxic levels of trazodone in Griswold's blood.[3] (ECF No. 77-7, PageID.3312, 3317, Tr. 18:4-7, Tr. 39:23-40:5).

---

[3] Trazodone is an antidepressant.  It works through "increasing the activity of serotonin in the brain." https://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/description/drg-20061280 (last visited Mar. 6, 2025).

B.    *Procedural History*

Griswold's estate commenced this wrongful death action against, among others, the Livingston County Defendants pursuant to 42 U.S.C. § 1983. (ECF No. 5).  The amended complaint alleges that they exhibited deliberate indifference to Griswold's serious medical needs in violation of the Fourteenth Amendment. (*Id.*, PageID.36-37, ¶¶ 54-59).   The Livingston County Defendants now move for summary judgment. (ECF No. 53).

III.   Legal Standards

A moving party is entitled to summary judgment where the "materials in the record" do not establish the presence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c).  All the evidence, along with all reasonable inferences, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The record contains 11 videos of the main incident in question. (*See, e.g.*, ECF Nos. 53-3, 53-4, 53-5, 53-6, 53-8, 53-9, 53-13, 53-22, 53-23, 53-24, 53-25).  The Court views the facts "in the light depicted by the videotape" and may not adopt a factual account that is "blatantly contradicted by the record." *Jackson-Gibson v. Beasley*, 118 F.4th 848, 853-54 (6th Cir. 2024) (quotation omitted).  The video's "gaps or uncertainties" must be construed in the Estate's favor. *Naji v. City of Dearborn, Michigan*, 120 F.4th 520, 523 (6th Cir. 2024) (quotation omitted).

8

IV.  <u>Analysis</u>

A.  *Qualified Immunity Overview*

Section 1983 civil rights plaintiffs must establish that a person acting under the color of state law deprived them of a guaranteed right under the United States Constitution or federal law. *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-56 (1978). Government officials typically invoke the defense of qualified immunity to shield themselves from personal liability "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006). Whether an official should be entitled to qualified immunity is a legal question for the courts to decide. *Elder v. Holloway*, 510 U.S. 510, 516 (1994); *see also Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004).

Federal courts use a two-pronged test to evaluate whether qualified immunity is appropriate. The relevant inquiry is (1) "whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated," and (2) "whether that right was clearly established." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (quotation omitted). While the plaintiff bears the ultimate burden of showing that the official is not entitled to qualified immunity, *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006), the defendant has the initial burden of

showing that his conduct was objectively reasonable under then-existing law. *Tucker*, 388 F.3d at 220.

The burden then shifts to the "plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Gardenhire*, 205 F.3d at 311; *see also Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The violated right must have been "clearly established at the time" of the incident. *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019). That means courts may "consider only the legal rules existing when the challenged conduct occurred, not legal rules adopted by later caselaw." *Lawler v. Hardeman Cnty.*, 93 F.4th 919, 926 (6th Cir. 2024) (quotation omitted); *see also Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022) (requiring courts to "look to the law at the time the official acted" when ascertaining whether a right is clearly established).

Summary judgment on the ground of qualified immunity is improper when "there is a factual dispute (*i.e.*, a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." *Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988) (citations omitted).

    B.    *Constitutional Violation – Fourteenth Amendment Deliberate Indifference*

Griswold was a pretrial detainee when he passed away because "a court had yet to try or punish him." *Lawler*, 93 F.4th at 926.  Pretrial detainees possess a Fourteenth Amendment right under the United States Constitution not to be "deprive[d]" of their "life" "without due process of law." U.S. Const. amend. XIV, § 1.  This right, at the very least, mirrors "those afforded convicted prisoners under the Eighth Amendment." *Lawler*, 93 F.4th at 926; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998).

The Eighth Amendment prohibits the government from inflicting "cruel and unusual punishments" upon incarcerated individuals. U.S. Const. amend. VIII; *United States v. Campbell*, 245 F. App'x 505, 508 (6th Cir. 2007).  The amendment bars prison officials from "unnecessarily and wantonly inflicting pain" on inmates by acting with "deliberate indifference" to their serious medical needs. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quotation omitted). Deliberate indifference may take the form of delayed medical treatment, *Blackmore*, 390 F.3d at 899, inadequate treatment, *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011), or the failure to provide any treatment, *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448-449 (6th Cir. 2014).

Under Sixth Circuit precedent:

11

> A claim of deliberate indifference under the Eighth Amendment has both an objective and a subjective component. The objective component requires the existence of a sufficiently serious medical need. To satisfy the subjective component, the defendant must possess a "sufficiently culpable state of mind," rising above negligence or even gross negligence and being "tantamount to intent to punish." Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." Mere negligence will not suffice. Consequently, allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment.

*Broyles v. Corr. Medical Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (internal citations omitted) (footnote added).

Pretrial detainees must demonstrate that jail staff knew of and disregarded an excessive risk to their health or safety by showing that (1) the officer was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and (2) the officer actually drew the inference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Burwell v. City of Lansing*, 7 F.4th 456, 466 (6th Cir. 2021). In plain terms, the officer must recognize the potential for harm to the detainee and then fail to prevent or avert that harm.[4]

---

[4] Under the current standard for assessing a Fourteenth Amendment failure-to-protect claim "officers can face liability even if they did not actually know of a risk of harm to a pretrial detainee." *Lawler*, 93 F.4th at 927. Now, "[p]retrial detainees need only prove that the officers *recklessly disregarded* a risk so obvious that they either knew or should have known of it." *Id.* (emphasis in original). Because

1.    The Objective Prong

The objective element in a deliberate indifference claim requires a showing that the pretrial detainee faced a "substantial risk of serious harm" before suffering an injury. *Lawler*, 93 F.4th at 928; *see also Farmer*, 511 U.S. at 834.  Detainees may satisfy the objective prong if they have a serious medical need or condition. *See Lawler*, 93 F.4th at 928.  Objectively serious medical conditions are ones that a physician has diagnosed "as needing treatment" or ones that are so obviously serious "that even a lay person would easily recognize the necessity for a doctor's attention." *Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017) (citation omitted).

Griswold exhibited an "obvious need for medical care." *Blackmore*, 390 F.3d at 900.  He stumbled and swayed after returning from the hospital.  He could not stand straight, or on his own power, while Deputy Linden removed his handcuffs. He vomited profusely over his clothes and face.  Over the course of almost 13 hours, he appeared unable to clean himself, to elevate his head and torso to clear away the remaining vomit, or to shift the position of his body away from the pool of vomit collecting on the cell floor.  And he did not appear capable of verbalizing a request for assistance.

---

Griswold's incarceration occurred in October 2018, the Court applies the deliberate indifference test – the legal standard then in place. *See id.* at 927-28 (holding that Sixth Circuit "decisions applying *Farmer* to the claims of pretrial detainees provide the only clearly established law in 2018.").

Taken together, the vomiting along with his significantly diminished motor and cognitive functioning, could lead a reasonable jury to find that Griswold was experiencing an objectively serious medical episode. *See, e.g., Burwell*, 7 F.4th at 465 (holding the objective prong satisfied where the detainee vomited in his cell and "laid unconscious in that vomit for two hours without any apparent movement."); *Bowles v. Bourbon Cty.*, No. 21-5012, 2021 U.S. App. LEXIS 21292, at *24 (6th Cir. Jul. 19, 2021) (objective prong met where detainee "suffered from a persistent migraine-like headache, vomiting, and nausea that ended with intubation and death"); *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (objective component met where detainee vomited more than once, "suffered bouts of diarrhea," and "was seen lying on the floor of a cell or in the fish bowl"); *Blackmore*, 390 F.3d at 899 ("Blackmore vomited – a clear manifestation of internal physical disorder.").

### 2.    The Subjective Prong

Courts "must address the subjective component for each officer individually." *Burwell*, 7 F.4th at 466; *see also Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).   The plaintiff may resort to "ordinary methods of proof," including circumstantial evidence, to show that a jail official subjectively appreciated the substantial risk of serious harm posed to the detainee. *Rouster*, 749 F.3d. at 447.   An official "may not escape liability if the evidence showed that he

merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (quotation omitted).  A jury could even reasonably infer that "a prison official knew of a substantial risk from the very fact that the risk was obvious." *Rouster*, 749 F.3d at 447.

Whether an individual defendant subjectively knew that Griswold was experiencing a serious medical episode depends upon three factors: (1) awareness that he had vomited, (2) awareness of his previous discharge from the hospital, and (3) awareness of his diminished motor and cognitive functioning.  The following table charts each individual defendants' spectrum of knowledge concerning each factor.  A "Yes" designation means that a genuine factual question exists as to whether the individual defendant knew about a specific factor.

| Defendant | Vomit | Hospital Visit | Diminished Motor/Cognitive Function |
|---|---|---|---|
| Sheriff Murphy | No | No | No |
| Deputy Christopher Marquette | No | No | No |
| Deputy Alicia Famie | No | No | No |
| Deputy David Loar | No | No | No |
| Deputy Kurt Heiob | Yes | No | No |
| Deputy Vincent John | Yes | Yes | No |
| Deputy Eric VanVleet | Yes | Yes | Yes |
| Deputy Allison Schulte | Yes | Yes | No |
| Deputy Patrick Turchi | Yes | Yes | Yes |
| Deputy Travis Linden | Yes | Yes | Yes |
| Sergeant Terry Davis | Yes | Yes | Yes |

15

The chart illustrates how each individual defendants' awareness of Griswold's serious medical condition varied.   As a guiding principle, the extent of their knowledge about Griswold's condition directly correlates to the level of their personal interaction with him.

Viewing the evidence in the Estate's favor, the record is insufficient to support a finding of deliberate indifference as to Sheriff Murphy (in his individual capacity) and Deputies Christopher Marquette, Alicia Famie, and David Loar.   There are genuine factual questions, however, as to whether Sergeant Davis and Deputies Kurt Heiob, Vincent John, Eric VanVleet, Allison Schulte, Patrick Turchi, and Travis Linden recognized the substantial risk of serious harm to Griswold and failed to prevent or avert it.

*Sheriff Murphy*.   There are no material facts showing that Sheriff Murphy was subjectively aware of and disregarded Griswold's serious medical condition.   Sheriff Murphy never interacted with Griswold personally.   There is no evidence that he even knew of Griswold's incarceration at the jail.   The Estate does not refute the Sheriff's testimony that he first became aware of Griswold's death "[t]he morning of his passing." (ECF No. 77-11, PageID.3521, Tr. 23:9).   And the Estate's counsel acknowledged at the hearing that Sheriff Murphy's role in this case is solely "premised upon his negligent failure to train the staff in policies and procedures." (ECF No. 104, PageID.4616, Tr. 85:15-17).   Consequently, the deliberate

16

indifference claim asserted against Sheriff Murphy in his individual capacity must be dismissed.

*Deputy Christopher Marquette*.  Deputy Marquette's involvement in this case is limited.  He passed through the intake unit on his way back to his station at the housing unit at 2:09 A.M. (ECF No. 53-25, Counter 2:09:42-47; ECF No. 53-18, PageID.1018, 1020, Tr. 9:12-17, Tr. 13:9-12).  He walked in front of Griswold's cell for approximately five seconds and "glance[d]" in. (ECF No. 53-25, Counter 2:09:42-47; ECF No. 53-18, PageID.1022, Tr. 15:19).  He did not recall seeing any vomit in the cell.  And there is no evidence that he knew about Griswold's previous hospital visit or his diminished motor and cognitive functioning. (ECF No. 53-18, PageID.1021, Tr. 14:1-3).  This single event cannot sustain a claim for deliberate indifference.

*Deputy Alicia Famie*.  Deputy Famie was assigned to the housing unit with Deputy Marquette on the early morning of October 15. (ECF No. 53-17, PageID.1004, Tr. 9:14-22).  She walked into the intake unit with Deputy Marquette at 5:05 A.M. to place another detainee in the cell adjacent to Griswold's. (*Id.*, PageID.1005-06, Tr. 10:7-16, 11:4-5; ECF No. 23-25, Counter 5:05:40-5:06:45).  She seemed to notice Griswold lying on the floor and placed her face to the glass panel of his cell, cupping her left eye with her left hand to shade her perspective from the glass's reflection. (*Id.*, Counter 5:05:57).  She peered in for approximately

six seconds before returning her attention to the other detainee. (*Id.*, Counter 5:05:54-5:06:00). She then left the intake unit altogether. (*Id.*, Counter 5:06:00-5:06:45). Deputy Famie did not recollect seeing any vomit in Griswold's cell and there is no evidence from which to infer that she knew about his previous hospital visit or his diminished motor and cognitive functioning. (ECF No. 53-17, PageID.1007-08, Tr. 12:13-13:3). As with Deputy Marquette, her passing observation does not constitute deliberate indifference.

*Deputy David Loar.* Deputy Loar was assigned to the Sheriff Work Assignment Program on October 15.[5] (ECF No. 53-19, PageID.1030, Tr. 10:11-14). He walked through the intake unit at 6:52 A.M. on his way to the shower room to "fill a container with water for a[n inmate] work team as [they] left the jail." (*Id.*, PageID.1031, Tr. 11:10-16; ECF No. 23-24, Counter 6:52:03-09). He stopped in the hallway in front of Griswold's cell and bent his body forward slightly to look at Griswold's position on the floor. (*Id.*, Counter 6:52:03-09). The encounter lasted all of six seconds. (*Id.*). Deputy Loar did not remember seeing any vomit in Griswold's cell and there is no evidence from which to infer that he knew about Griswold's previous hospital visit or his diminished motor and cognitive functioning. (ECF No.

---

[5] This program appears to be an alternative to incarceration, "that substitutes community labor, rather than incarceration, for carefully selected offenders." https://www.washtenaw.org/1404/Community-Work-Program-CWP (last visited Mar. 6, 2025).

53-19, PageID.1034, 1037, Tr. 14:20-24, 19:4-6).   No reasonable jury would conclude that Deputy Loar exhibited deliberate indifference to Griswold's serious medical condition.[6]

*Deputy Kurt Heiob*.   Deputy Heiob performed two cell checks on Griswold – one at 7:07 A.M. and another at 7:42 A.M.   Focusing on the first cell check,[7] Deputy Heiob approached Griswold's cell with Deputy Eric VanVleet, placed his face close to the cell glass, and stared into the cell for approximately 13 seconds. (ECF No. 23-25, Counter 7:07:09-22).   He then turned away to oversee breakfast service to a group of inmates in another cell, 3 to 5 feet across from Griswold's. (*Id.*, Counter 7:07:23-7:08:10).   A minute later, he walked back towards Griswold's cell, leaned on an adjoining wall, and placed his face within inches of the cell glass. (*Id.*, Counter 7:08:10-11).   He observed Griswold for 16 seconds before turning to his left and walking off-camera. (*Id.*, Counter 7:08:11-27).   Griswold hardly moved. (ECF No. 23-24, Counter 3:07:06-3:08:27).

Deputy Heiob testified that he did not recall seeing vomit on Griswold or on the floor of his cell. (ECF No. 53-28, PageID.1107-08, 1110, Tr. 17:21-18:1, 27:20-

---

[6] Deputy Loar passed through the intake unit again at 7:15 A.M. (ECF No. 23-25, Counter 7:15:29-38).   This time he glanced at Griswold's cell for two seconds. (*Id.*, Counter 7:15:29-30).

[7] Recounting the events surrounding the 7:42 A.M. cell check would be duplicative. The Court already summarized what transpired in the "Factual History" section to this opinion and order.

22).  And there is no evidence from which to infer that he knew about Griswold's previous hospital visit or his diminished motor and cognitive functioning. (*Id.*, PageID.1111, Tr. 28:4-8, 16-20).

Nonetheless, a reasonable jury could infer that Deputy Heiob did in fact see vomit as Griswold lay still on the floor.  Video footage from Griswold's cell shows him not moving while sprawled out on the floor next to a puddle of vomit. (ECF No. 23-24, Counter 3:07:06-3:08:27).  The Livingston County EMS technician who responded to the scene found Griswold with a "fully obstructed" airway and noted that he had "copious amounts of emesis in his mouth and nose/nostrils." (ECF No. 77-16, PageID.3678).  The technician described Griswold with "thick green colored vomit around his mouth and coming out of his nostrils." (*Id.*, PageID.3681).  The technician had to suction his airway clear before attempting to resuscitate him. (*Id.*, PageID.3678).  And a Sheriff's Office supplemental investigation report found that Griswold had "vomited possibly twice," that "there was also vomit present during resuscitation efforts," and that postmortem photographs depicted "brown and yellow vomit discharge coming from [an] intubation tube." (ECF No. 77-20, PageID.3864).

Viewing this evidence in the Estate's favor, there is a genuine factual question as to whether Deputy Heiob was deliberately indifferent to Griswold's serious medical condition.

*Deputy Vincent John*.  Deputy John performed three cell checks on Griswold – 6:04 A.M., 7:08 A.M., and 7:42 A.M.[8]  At the 6:04 A.M. cell check, Deputy John approached Griswold's cell with Deputy VanVleet. (ECF No. 23-25, Counter 6:04:31).  He stopped within inches of the cell glass door. (*Id.*, Counter 6:04:35).  He peered in at Griswold lying motionless on the floor for approximately 8 seconds before walking off-camera. (*Id.*, Counter 6:04:35-43).  During the 7:08 A.M. cell check, Deputy John walked to the cell glass door, looked at Griswold lying still in the same position, and continued to examine Griswold as he walked along the cell glass panels until he exited the intake hallway.  The entire cell check last about 10 seconds. (*Id.*, Counter 7:08:15-25).

Deputy John testified that he did not recall seeing vomit on Griswold or on the cell floor. (ECF No. 77-15, PageID.3667, Tr. 28:3-15).  And there is no evidence from which to infer that he knew about Griswold's diminished motor and cognitive functioning.  He did know about Griswold's previous hospital visit.  Deputy John testified that he "knew that [Griswold] obtained clearance from the hospital to be in the jail facility" and that the hospital clearance "was mentioned sometime during the passing throughout the morning." (*Id.*, PageID.3666, Tr. 22:6-14).

This awareness of Griswold's prior hospital visit, coupled with the video footage of Griswold lying still on the cell floor in a puddle of vomit (ECF No. 23-

---

[8] *See* footnote 7.

24, Counter 2:04:28-2:04:44, 3:08:14-3:08:23), together with the documentary evidence indicating the apparent presence of vomit in Griswold's mouth and nose (ECF No. 77-16, PageID.3678, 3681; ECF No. 77-20, PageID.3864), are sufficient to raise a genuine factual question as to whether Deputy John recognized the potential harm to Griswold and failed to prevent or avert it.

*Deputy Eric VanVleet*.   Deputy VanVleet performed two cell checks on Griswold – one at 6:04 A.M. and another at 7:07 A.M. (ECF No. 103, PageID.4530; ECF No. 107, PageID.4775).   At the 6:04 A.M. cell check, Deputy VanVleet walked with Deputy John to within inches of Griswold's cell glass. (ECF No. 23-25, Counter 6:04:15-28).   He stared at Griswold lying still on the floor for approximately 15 seconds before walking off-camera. (*Id.*, Counter 6:04:28-43).   During the 7:07 A.M. cell check, Deputy VanVleet again walked within inches of Griswold's cell glass. (*Id.*, Counter 7:07:04-08).   He looked at Griswold lying still on the floor for approximately 18 seconds. (*Id.*, Counter 7:07:09-27).   In that time, he tapped the cell glass. (*Id.*, Counter 7:07:21-22).   Griswold moved his leg slightly in response. (ECF No. 23-24, Counter 3:07:07-28).

Deputy VanVleet testified that he did not recall seeing vomit on Griswold or the floor of his cell. (ECF No. 77-14, PageID.3639, 3647, Tr. 13:1-5, 46:21-47:11). He also disclaimed that he ever received information about Griswold's prior hospital visit. (*Id.*, PageID.3649, Tr. 53:4-7).   A reasonable jury could conclude otherwise.

Deputy VanVleet acknowledged that video footage from Griswold's cell clearly depicted him lying in vomit and that the vomit should have been "readily apparent" during the 6:04 A.M. cell check. (*Id.*, PageID.3644, Tr. 34:6-14).   The documentary evidence – indicating a pronounced amount of vomit in Griswold's mouth and nose – confirms this observation. (ECF No. 77-16, PageID.3678, 3681; ECF No. 77-20, PageID.3864).   What is more, Deputy John – Deputy VanVleet's morning shift partner – testified that he was aware of Griswold's hospital clearance because "[i]t was mentioned sometime during the passing throughout the morning." (ECF No. 77-15, PageID.3666, Tr. 22:13-14).  A reasonable jury could reject Deputy VanVleet's testimony on this score; inferring that shift partners, working side-by-side, and charged with supervising the same inmates, most likely received the same access to this critical piece of information.

Whether Deputy VanVleet perceived that Griswold was experiencing diminished motor and cognitive functioning raises another factual question.  Deputy VanVleet testified (and informed investigators) that he smacked Griswold's cell glass at the 6:04 A.M. cell check and that Griswold "opened his eyes and looked at me." (ECF No. 77-14, PageID.3643, Tr. 31:19-25, Tr. 32:15-19).   But when he smacked Griswold's cell glass a second time, at the 7:07 A.M. cell check, he provided divergent accounts concerning whether Griswold opened his eyes to the resulting the sound.  He told investigators that Griswold did open his eyes. (ECF No.

77-20, PageID.3863).  In another statement, he claimed that Griswold never opened his eyes. (ECF No. 77-14, PageID.3645, Tr. 39:15-23).  And at his deposition he could not recall one way or the other. (*Id.*, PageID.3646, Tr. 43:6-13).  A jury could resolve this discrepancy in the Estate's favor and reasonably conclude that Deputy VanVleet should have taken additional measures to assure Griswold's safety when he did not respond to the deputy's efforts to rouse him.[9]

For all these reasons, whether Deputy VanVleet exhibited deliberate indifference to Griswold's serious medical condition presents a genuine question of material fact.

*Deputy Allison Schulte*.  Deputy Schulte performed approximately 17 cell checks on Griswold, spanning from 6:35 P.M. on October 14 through 4:56 A.M. on October 15. (ECF No. 103, PageID.4528-29).  Most of them lasted about 3-5 seconds.

Deputy Schulte offered conflicting statements about when she realized Griswold had vomited.  On the one hand, she recalled observing from the intake control pod video that Griswold had vomited on himself. (ECF No. 77-13, PageID.3615, Tr. 26:7-27:5).  On the other, she testified that she did not know

---

[9] Deputy VanVleet smacked Griswold's cell glass on another occasion, while passing through the intake unit hallway at 7:15 A.M. (ECF No. 23-25, Counter 7:15:20-21; ECF No. 107, PageID.4777).  Griswold continued to lay on the cell floor, unresponsive. (ECF No. 23-24, Counter 3:15:18-21).

Griswold had vomited "[o]n the date in question." (*Id.*, PageID.3612, Tr. 14:25-15:4).  She did acknowledge, however, that the vomit was apparent from the intake control pod video. (*Id.*, PageID.3615, Tr. 27:2-5).  And she admitted that she would have observed Griswold in his cell through that same video feed during her shift. (*Id.*, PageID.3618, Tr. 38:13-22).[10]

Although there is no evidence from which to infer that Deputy Schulte knew about Griswold's diminished motor and cognitive functioning, she was aware of Griswold's previous hospital visit.  Deputy Schulte testified that she "knew [Griswold] got sent out and went to the hospital" from a "[verbal] passdown of the prior deputies" and that he required medical clearance before returning to the jail. (*Id.*, PageID.3613, Tr. 18:19-21; PageID.3611, Tr. 11:23-24).

This awareness of Griswold's prior hospital visit, coupled with the video footage of Griswold lying still on the cell floor in a puddle of vomit – which Deputy Schulte would have observed from the intake control pod, and the documentary evidence indicating the obvious presence of vomit in Griswold's mouth and nose (ECF No. 77-16, PageID.3678, 3681; ECF No. 77-20, PageID.3864), together raise a genuine factual question as to whether Deputy Schulte was deliberately indifferent to Griswold's serious medical condition.

---

[10] Deputy Linden testified that the vomit was apparent at his 8:27 P.M. cell check – almost a half hour before Schulte's 8:55 P.M. cell check. (ECF No. 77-10, PageID.3472, Tr. 106:4-8; ECF No. 77-13, PageID.3616, Tr. 29:20-22).

*Deputy Patrick Turchi*.  Deputy Turchi performed approximately 7 cell checks on Griswold, from 8:27 P.M. on October 14 through 5:26 A.M. on October 15. (ECF No. 103, PageID.4528-29; ECF No. 107, PageID.4774).  He also assisted Deputy Linden with removing Griswold's handcuffs at 7:00 P.M. (ECF No. 53-22, Counter 54:41-57:41).

Deputy Turchi's most involved cell check occurred at 8:40 P.M. – after Griswold had already vomited.  Deputy Turchi approached Griswold's cell with Deputies Linden and Sutfin. (ECF No. 53-13, Counter 2:40:12-20).  Deputy Linden opened the cell door, stood in the doorway, and spoke to Griswold for almost a minute. (*Id.*, Counter 2:40:20-2:41:19).  Deputy Turchi stood next to Deputy Linden outside the cell, but at the doorway, looking at Griswold through the cell glass during the conversation. (*Id.*).  Meanwhile, Griswold laid on the floor, arms and legs crossed, leaning against the cell wall, with noticeable amounts of vomit on his shirt, his pants, and on the cell floor next to him. (ECF No. 53-22, Counter 2:33:32-2:34:34).

Deputy Turchi did not recall knowing whether Griswold had vomited by 8:40 P.M., but he did acknowledge that the vomit was apparent from the cell video footage at that time. (ECF No. 77-9, PageID.3422, Tr. 80:1-19).  He also did not recall smelling vomit emanating from Griswold's cell even though his sense of smell is unimpaired. (*Id.*, PageID.3423, 3426, Tr. 81:3-8, Tr. 96:24-97:1).  He did know that

Griswold required hospital clearance before returning to the jail. (*Id.*, PageID.3420, Tr. 71:1-5).

Deputy Turchi saw that Griswold was stumbling and uncoordinated when he assisted Deputy Linden with removing Griswold's handcuffs at 7:00 P.M. (*Id.*, PageID.3415-16, Tr. 49:18-50:13; Tr. 55:21-56:1).  He recalled that Griswold never opened his eyes or responded verbally throughout that interaction. (*Id.*, PageID.3414, Tr. 48:4-17).  And Deputy Turchi recognized that Griswold had not moved from his seated position when he returned to the cell with Deputy Linden at 8:40 P.M. – over an hour and a half later. (*Id.*, PageID.3423, Tr. 81:9-12).

Taken together, the video footage of Deputy Turchi looking at Griswold lying still on the cell floor, soaked in a puddle of vomit at the 8:40 P.M. cell check, his proximity to the open cell doorway where he could have smelled the vomit, his awareness of Griswold's prior hospital visit, his testimony about Griswold's lack of responsiveness and motor coordination, along with the documentary evidence indicating the apparent presence of vomit in Griswold's mouth and nose (ECF No. 77-16, PageID.3678, 3681; ECF No. 77-20, PageID.3684), are sufficient to raise a genuine factual question as to whether Deputy Turchi acted with deliberate indifference to Griswold's serious medical needs.

*Deputy Travis Linden*.  Deputy Linden performed approximately 9 cell checks on Griswold, from 8:27 P.M. on October 14 through 5:18 A.M. on October 15. (ECF

No. 103, PageID.4528-30).  He also removed Griswold's handcuffs at 7:00 P.M. with Deputy Turchi's assistance. (ECF No. 53-22, Counter 54:41-57:41).

Deputy Linden's most noteworthy cell checks occurred at 8:40 P.M. and 3:15 A.M. – again, after Griswold had already vomited.  Focusing on the 3:15 A.M. cell check, Deputy Linden walked to Griswold's cell, opened the door, and appeared to talk to him for well over a minute. (ECF No. 53-25, Counter 3:15:50-3:17:09). Griswold remained on the floor, arms and legs crossed, leaning against the cell wall, with noticeable amounts of vomit on his shirt, pants, and on the cell floor next to him – nearly unchanged from his position at the 8:40 P.M. cell check, six and half hours earlier. (ECF No. 53-22, Counter 3:15:46-3:17:09).

Deputy Linden knew about Griswold's previous hospital visit. (ECF No. 77-10, PageID.3452, Tr. 28:8-11).  He admitted that he saw vomit on Griswold at the 8:40 P.M. cell check and that he would have smelled it. (*Id.*, PageID.3472, 3475, Tr. 106:4-8, Tr. 107:17-18, Tr. 118:4-6).  He testified that Griswold never talked to him at the 8:40 P.M. cell check or at any other time.[11] (*Id.*, PageID.3476, 3487, Tr. 121:18-122:4, Tr. 165:20-21).  And he recalled that Griswold never opened his eyes. (*Id.*, PageID.3474, Tr. 114:20-22).

---

[11] Deputy Linden told investigators that he also observed vomit in Griswold's cell at a 12:17 A.M. cell check. (ECF No. 77-10, PageID.3481, Tr. 141:25-142:4). Griswold did not speak or open his eyes at that time. (*Id.*, Tr. 142:5-7, 24-25).

28

As for the 3:15 A.M. cell check, Deputy Linden acknowledged that Griswold still did not interact with him, that he was lying in his own vomit, and that he did not appear "normal." (*Id.*, PageID.3481, Tr. 144:14-21).  When the Estate's counsel asked him whether he "could see that [Griswold] had vomited and was lying in his own pile of vomit and wasn't moving and wasn't responding, all that was – was known to you, wasn't it?" he responded "Yes." (*Id.*, PageID.3489, Tr. 175:1-5).

Because Deputy Linden observed that Griswold had vomited, he knew that Griswold needed hospital clearance before returning to the jail, and he directly observed Griswold's unresponsiveness and immobility, there is enough evidence for a reasonable jury to conclude that he exhibited deliberate indifference to Griswold's serious medical condition.

*Sergeant Terry Davis*.  Sergeant Davis performed two cell checks on Griswold – one at 6:35 P.M. on October 14 and another at 4:30 A.M. on October 15. (ECF No. 103, PageID.4528-29).  At the 6:35 P.M. cell check, Sergeant Davis entered Griswold's cell and appeared to speak with him for approximately 50 seconds. Griswold remained seated on the cell floor with his arms behind his back, handcuffed.  His chin rested on his chest.  And he did not appear responsive to Sergeant Davis's presence. (ECF No. 53-13 Counter 35:19-36:09; ECF No. 53-22, Counter 28:40-29:24).

During the 4:30 A.M. cell check, Sergeant Davis walked through the intake hallway, stopped, turned back to Griswold's cell, and knocked on the glass. He waited five seconds at the cell door before continuing through the intake unit and off-camera. (ECF No. 53-25, Counter 4:30:55-4:31:03). Griswold did not appear to respond. (ECF No. 53-24, Counter 30:55-31:03).

Sergeant Davis testified that he did not recall seeing vomit on Griswold or on his cell floor at the 4:30 A.M check. (ECF No. 77-12, PageID.3592-94, Tr. 44:13-22, Tr. 46:1-2, Tr. 50:4-5). He stated that he would "not necessarily" have entered Griswold's cell or called for medical support if he had seen the vomit. (*Id.*, PageID.3592-93, Tr. 44:23-45:4). And he admitted that he knew about Griswold's previous hospital visit. (*Id.*, PageID.3594, Tr. 51:16-19).

Still, a reasonable jury could find that Sergeant Davis did in fact see the vomit as Griswold laid still on the floor at the 4:30 A.M. check. Video footage from Griswold's cell shows him not moving while sprawled out on the floor next to a puddle of vomit. (ECF No. 53-24, Counter 30:55-31:03). And the documentary evidence – indicating "copious amounts" of vomit in Griswold's mouth and nose – again confirms this observation. (ECF No. 77-16, PageID.3678, 3681; ECF No. 77-20, PageID.3864).

Whether Sergeant Davis perceived that Griswold was experiencing diminished motor and cognitive functioning raises another factual question. He

attested that Griswold was responsive during the 6:35 A.M. cell check – "[h]e looked at me through his eyes . . . [h]is eyes moved up when I talked to him." (ECF No. 77-12, PageID.3590, Tr. 33:9, 18-19).  Yet Griswold was unresponsive by the time he conducted the 4:30 A.M. cell check – "he didn't respond to whatever it is I said or did." (*Id.*, PageID.3592, Tr. 41:15-16).  This distinct contrast in Griswold's reactive demeanor could lead a jury to reasonably conclude that Sergeant Davis perceived Griswold's significant motor and cognitive deterioration but failed to take any affirmative measures to secure Griswold's welfare.

For all these reasons, whether Sergeant Davis exhibited deliberate indifference to Griswold's serious medical condition presents a genuine question of material fact.

> C.   *Clearly Established Law – Fourteenth Amendment Deliberate Indifference*

Since there is enough evidence for a jury to reasonably conclude that Sergeant Davis and Deputies Heiob, John, VanVleet, Schulte, Turchi, and Linden exhibited deliberate indifference to Griswold's serious medical condition, the next question is whether the right they violated was clearly established in October 2018.

The scope of a clearly established right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Burwell*, 7 F.4th at 476 (quotation omitted).  The right is not defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).   It must be

"particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation omitted). Even still, the case need not "be on all fours in order to form the basis for the clearly established right." *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018) (quotation omitted). The "fact pattern" must only be "similar enough to have given fair and clear warning to officers about what the law requires." *Id.* (quotation omitted).

"As early as 1972," the Sixth Circuit has held that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) (quotation omitted). "[I]n 1992," the Sixth Circuit reiterated "that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Id.* And more recently, in *Burwell v. City of Lansing*, 7 F.4th 456 (6th Cir. 2021), the Sixth Circuit found that a detention officer in a local jail was deliberately indifferent to the serious medical needs of a pretrial detainee who died in his cell after "vomit[ing] while unconscious and remained motionless as the vomit pooled around his head." *Id.* at 473. The court of appeals held there, that "it was clearly established at the time of [the decedent's] detention" – on April 27, 2015 – "that declining to render aid to an unconscious detainee lying in a pool of vomit constitutes a constitutional violation." *Id.* at 477.

These same clearly established principles apply here. Placing aside the marginal factual differences between the circumstances leading to Griswold's death and those of the decedent in *Burwell*, the "fact patterns" are "similar enough" that Sergeant Davis and Deputies Heiob, John, VanVleet, Schulte, Turchi, and Linden should have received "fair and clear warning about what the law requires." *Hopper*, 887 F.3d at 755. That means they should have all known, by October 14, 2018 (the date Griswold's detention commenced), that declining to provide or seek medical assistance to a significantly impaired detainee, laying prone on his cell floor for up to 13 hours, in a pool of his own vomit, is a Fourteenth Amendment due process violation.

The Livingston County Defendants disagree. They seem to argue that *Burwell* is materially distinguishable because, unlike in that case, a physician at the hospital previously cleared Griswold for incarceration. (ECF No. 53, PageID.824-27). And they assert, correctly, that a "non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions." *Greene v. Crawford Cnty.*, 22 F.4th 593, 608 (6th Cir. 2022) (cleaned up).

But The Livingston County Defendants overlook a countervailing principle. While "a mistaken, albeit reasonable, belief" that "deference to a provider is warranted will not rise to the level of deliberate indifference," "[s]uch deference is

unreasonable in circumstances" where "the medical professional rendered their opinion prior to changed circumstances." *Grote v. Kenton Cnty.*, 85 F.4th 397, 412 (6th Cir. 2023).

That's exactly what occurred in this case. Griswold's condition continued to deteriorate after a hospital physician evaluated him and cleared him for incarceration at the jail. He became more unsteady in his gait, less communicative – to the point of unresponsive, and was eventually unable to shift his position as he lay on the cell floor. He also vomited, which is "a clear manifestation of internal physical disorder." *Blackmore*, 390 F.3d at 899. None of these developments should have surprised Sergeant Davis or Deputies Heiob, John, VanVleet, Schulte, Turchi, and Linden. Griswold's hospital discharge papers specifically warned that "[s]ignificant changes or worsening in your condition may require more immediate attention." (ECF No. 53-11, PageID.873). And it cautioned Griswold to "seek immediate medical care" in the event he experienced "recurrent vomiting." (*Id.*, PageID.876). This information could have been useful, except that Sergeant Davis and Deputies Heiob, John, VanVleet, Schulte, Turchi, and Linden never reviewed the discharge papers after Griswold returned from the hospital. (ECF No. 53-28, PageID.1112, Tr. 29:2-12; ECF No. 77-9, PageID.3409, Tr. 26:25-27:3; ECF No. 77-10, PageID.3485, Tr. 159:14-16; ECF No. 77-12, PageID.3594, Tr. 51:20-23; ECF No. 77-13,

PageID.3622, Tr. 54:17-56:3; ECF No. 77-14, PageID.3638, Tr. 9:20-10:13).  That oversight proved fatal.

The Livingston County Defendants further attempt to distinguish *Burwell* based upon the comparative severity of the decedent's objective symptoms.  They claim that Griswold's "single episode of vomiting" is not nearly as serious as what transpired in *Burwell*.  There, video evidence showed the decedent "bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly" before he collapsed to the cell floor and vomited. *Burwell*, 7 F.4th at 464.

The Livingston County Defendants oversimplify the comparison.  They ignore how Griswold's gait became increasingly unsteady, how his cognitive and motor functioning appeared to diminish substantially over time, how his inability to communicate became marked, that he could no longer alter his position as he lay prone on the cell floor, or even extricate himself from a puddle of his own vomit. These factors are sufficiently analogous to fall within *Burwell*'s reach.

Because the facts in *Burwell* largely track the material circumstances of Griswold's own death, it may serve as "fair notice" to Sergeant Davis and Deputies Heiob, John, VanVleet, Schulte, Turchi, and Linden that their "conduct was unlawful." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citations omitted); *see also Lawler*, 93 F.4th at 926.

35

### D.   *Individual Supervisory Liability Against Sheriff Murphy*

The Estate next alleges that Sheriff Murphy should be held liable in his individual supervisory capacity because he failed to train his deputies to follow the policies (1) requiring an intake reevaluation of a prospective detainee's health status when returning to the jail after receiving medical clearance, and (2) mandating that deputies contact jail medical staff when a detainee appears to be in health-related distress, even after receiving prior medical clearance. (ECF No. 77, PageID.3283-84).

Supervisors are not liable under section 1983 for failing to train subordinate employees unless they "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quotation omitted).  "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.*  The plaintiff "must point to" an individual supervisor's "specific action[s]" to prevail on the claim. *Phillips v. Roane County*, 534 F.3d 531, 544 (6th Cir. 2008).

The supervisor must also possess "some contemporaneous knowledge of his subordinates' unconstitutional conduct that resulted in a direct injury to the plaintiff." *Hubble v. Cnty. of Macomb*, No. 16-13504, 2019 U.S. Dist. LEXIS 68465, at *66-67 (E.D. Mich. Apr. 23, 2019); *see also Turner v. City of Taylor*, 412 F.3d

629, 643 (6th Cir. 2005) (dismissing a supervisory liability claim because there was "no evidence whatsoever that any of the supervisory Defendants either participated in the beatings or knew about them at any time.").

Sheriff Murphy never interacted with Griswold personally. There is no evidence showing that he was even aware of Griswold's incarceration at the jail. And the Estate never rebutted Sheriff Murphy's testimony that he first received notice of Griswold's death "[t]he morning of his passing." (ECF No. 77-11, PageID.3521, Tr. 23:9). The Estate's broader accusation that the individual deputies "were not properly trained [is] more appropriately submitted as evidence to support a failure-to-train theory against" Livingston County rather than Sheriff Murphy in his individual capacity. *Phillips*, 534 F.3d at 544; *see also Heyerman v. County of Calhoun*, 680 F.3d 642, 647-48 (6th Cir. 2012); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) (treating failure-to-train claims against individual supervisors as official capacity claims against the municipality where no evidence existed of their personal involvement in the specific incident of misconduct).

Based on this record, Sheriff Murphy is entitled to summary judgment on the Estate's individual supervisory liability claim. *See Hubble*, 2019 U.S. Dist. LEXIS 68465, at *67 (dismissing a supervisory liability claim asserted against a county sheriff where he "had no actual knowledge" of the decedent or "her condition or her treatment by jail or medical staff until after her death.").

E.    *Municipal Liability*

The Estate is likewise pursuing a municipal liability claim against Livingston County under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  The Estate's specific theory of liability is that the County failed to train its jail services deputies to follow the policies (1) requiring an intake reevaluation of a prospective detainee's health status when returning to the jail after receiving medical clearance, and (2) mandating that they contact jail medical staff when a detainee appears to be in health-related distress, even after receiving prior medical clearance.[12] (ECF No. 77, PageID.3283; ECF No. 104, PageID.4662-65, Tr. 131:21-132:1, Tr. 133:24-134:3).

"A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018).  To prevail on a section 1983 claim against a municipality, the plaintiff must show that a municipal policy or custom violates a federal right. *Monell*, 436 U.S. at 690-91, 694.  The Estate may establish municipal liability through (1) the existence of an illegal official policy or legislative

---

[12] At the hearing, the Estate's counsel abandoned its municipal liability theory predicated upon Sheriff Murphy's alleged inadequate investigation of Griswold's death. (ECF No. 77, PageID.3284; ECF No. 104, PageID.4662-65, Tr.131:21-132:1, Tr. 133:18-134:3). *See Brainard v. Secretary of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (holding that an argument was abandoned when counsel did not pursue it before an administrative law judge and did not present the argument to the district court).

enactment, (2) an official with final decision-making authority who ratifies illegal actions, (3) the existence of a policy of inadequate training or supervision, or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  A suit against individual defendants in their official capacities – such as Sheriff Murphy – is "analogous to a suit against the local entity." *Pineda v. Hamilton County*, 977 F.3d 483, 494 (6th Cir. 2020).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  There are two ways to demonstrate that a municipality failed to train or supervise its employees.  The first method is where the plaintiff shows a "pattern of similar constitutional violations by untrained employees" and the County's "continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015) (cleaned up).  These two elements demonstrate "the deliberate indifference necessary to trigger municipal liability." *Id.*

The second method is where the plaintiff points to "a single violation of federal rights, accompanied by a showing that the County has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.* at 739 (cleaned up).  This alternative is open "in a

narrow range of circumstances where a federal rights violation may be a highly predictable consequence of a failure to equip employees with specific tools to handle recurring situations." *Id.* at 739 (cleaned up).

Because the Estate did not identify a "pattern of similar constitutional violations" it must follow the second "mode of proof" by demonstrating that (1) a single violation occurred, *i.e.*, the deliberate indifference to Griswold's serious medical condition, (2) the type of violation is a recurring situation, (3) the type of violation raises the obvious potential for a constitutional violation. *Id.*

The basic question in this second class of cases is whether Livingston County's "failure to train its employees amounted to deliberate indifference, on behalf of the County, to the rights of detainees." *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 323 (6th Cir. 2023).  The Estate must prove three elements: (1) the County's "training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Id.* (quotation omitted); *see also Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018).

The second element – the municipality's deliberate indifference – requires proof that "the violation of a clearly established right was a known or obvious consequence of the lack of training or supervision." *Gambrel v. Knox Cty.*, 25 F.4th

391, 408 (6th Cir. 2022) (quotation omitted); *see also Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017).

The third element – actual causation between the inadequate training and Griswold's death – requires evidence of "but-for (or factual) causation and proximate causation." *Gambrel*, 25 F.4th at 408; *see also Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608-11 (6th Cir. 2007).  With respect to factual causation, the Estate "cannot hold the municipality liable without proof that proper training would have prevented" the jail services deputies' deliberate indifference to Griswold's serious medical needs. *Gambrel*, 25 F.4th at 409; *see also Carey v. Helton*, 70 F. App'x 291, 294-95 (6th Cir. 2003) (per curiam).  As for proximate causation, the Estate must show that "a municipality could reasonably foresee that an employee's wrongful act would follow from the lack of training." *Gambrel*, 25 F.4th at 409; *see also Crabbs v. Scott*, 800 F. App'x 332, 338 (6th Cir. 2020).

### 1.      Adequacy of the Training

A municipality's failure to train its employees on jail policies does not "necessarily demonstrate[ ] deliberate indifference to . . . constitutional due process rights." *Porro v. Barnes*, 624 F.3d 1322, 1329 (10th Cir. 2010).  Inadequate policy training must violate a constitutional standard and result in a constitutional harm, which the policies are intended to prevent. *See id.* ("Policies are often prophylactic, setting standards of care higher than what the Constitution requires.").  The Estate's

assertion that the jail services deputies did not receive adequate training on jail policies is, in effect, an argument that the County failed to train them to (1) evaluate detainees for indications of serious medical distress, and (2) recognize those symptoms of serious medical distress warranting immediate medical intervention. The evidence (or lack thereof) supports this theory.

None of the deputies testified that they received training on how to identify whether a detainee is suffering from a form of toxicity, overdose, or some other severe internal physical disorder. The County produced no training manuals, protocols, curriculums, completion certificates, training logs, or personnel files showing that jail services deputies are trained to address these emergent medical situations. Nor is it apparent that the County ever provided these materials to its jail policies expert prior to his deposition. (ECF No. 77-18).

Sheriff Murphy did testify that the jail services deputies are trained in CPR. (ECF No. 77-11, PageID.3528, Tr. 49:3-4). But when asked whether the deputies are "supposed to know that vomiting may be an indication of medical problem," he was unaware of any specific training on that topic. (*Id.*, Tr. 49:5-8) ("I don't know what the class is, to be honest with you."). And he disagreed with the notion that deputies should be trained to recognize that detainees may be suffering from a "medical crisis" when they are verbally non-responsive. (*Id.*, PageID.3529, Tr. 54:3-10).

A reasonable jury could also infer the County's failure to train from the deputies' own statements.  Deputy Linden testified that the County never tested him on the jail's policies. (ECF No. 77-10, PageID.3455, Tr. 37:14-15).  And some of the deputies viewed Griswold's unresponsiveness to verbal prompts as behavioral obstinance, rather than perceiving his silence as an inability to answer intake questions and the sign of a worsening severe medical impairment. (ECF No. 77-10, PageID.3649, Tr. 96:15-21; ECF No. 77-12, PageID.3596, Tr. 57:7-14, 25, Tr. 58:1).

The lack of training evidence, coupled with the individual defendants' deposition statements, could lead a reasonable jury to conclude that the County inadequately trained its jail services deputies to "identify or address a medical emergency" and that any "training program to the extent that it existed, was insufficient." *Helphenstine*, 60 F.4th at 325.

### 2.    The County's Deliberate Indifference

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (cleaned up).  A municipality "could be liable under § 1983 without proof of a pre-existing pattern of violations" when the "unconstitutional consequences of failing to train" employees are "patently obvious." *Id.* at 64.  Placing jail services deputies in situations where they must exercise "professional judgment that lies outside their area of expertise may

43

demonstrate deliberate indifference." *Helphenstine*, 60 F.4th at 325 (citation omitted).

At the time of Griswold's death, Livingston County retained either a nurse practitioner, a registered nurse, or a licensed practical nurse to remain at the jail until 10:00 P.M. daily. (ECF No. 77-11, PageID.3536, Tr. 81:1-13).  No other medical professionals stayed onsite from then until 6:00 A.M. (*Id.*, Tr. 81:14-17).  Deputy Linden testified that, in the absence of an onsite medical provider, jail services deputies often had to make their own independent assessment of a detainee's medical symptoms to determine whether hospitalization, or some other medical intervention, was warranted. (ECF No. 77-10, PageID.3467, Tr. 85:21-86:4).  Other deputies confirmed this predicament.  Yet the record is devoid of any evidence that the County trained its jail services deputies to (1) evaluate detainees for indications of serious medical distress, or (2) recognize those symptoms of serious medical distress warranting immediate medical attention.

The lack of deputy training, as well as the absence of onsite medical providers for a sizable portion of the night shift, raises sufficient factual questions about whether the County "effectively" tasked its jail services deputies with making "determinations about what constituted a medical emergency – a requirement well outside their area of expertise." *Helphenstine*, 60 F.4th at 325.  A reasonable jury could, therefore, find that the "possible unconstitutional consequences" of the

County's inadequate training are "patently obvious," *i.e.*, that critically ill detainees would not receive essential medical services. *Id.*; *see also Estate of* Carter, 408 F.3d at 313 (noting that "a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987.").

### 3. Actual Causation

Whatever triggered Griswold's serious medical episode (whether it stemmed from a trazodone overdose or some other drug toxicity), a reasonable jury could decide that the County's failure to train its jail services deputies is what led to Griswold's death.  Not only that, a jury may also conclude that Livingston County "could reasonably foresee" that the jail services deputies' deliberate indifference to Griswold's serious medical needs "would follow from the[ir] lack of training." *Gambrel*, 25 F.4th at 409.

Because there is sufficient evidence to find that the County's training was inadequate, that the inadequacy resulted from the County's deliberate indifference, and that the inadequacy caused Griswold death, the Estate's failure-to-train claim withstands summary judgment.

### F. *Official Capacity Claims Against Sheriff Murphy*

That leaves the official capacity claims asserted against Sheriff Murphy. Because any claims asserted against him in his official capacity are duplicative of the municipal liability claim asserted against Livingston County, the claims asserted

against Sheriff Murphy in his official capacity must be dismissed. *See Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996) ("We will also affirm the dismissal of the official capacity claims against [three municipal officials] because a suit against an official of the state is treated as a suit against the municipality."); *see also Direct Constr. Servs., LLC v. City of Detroit*, 820 F. App'x 417, 425-26 (6th Cir. 2020) (affirming the district court's dismissal of official capacity claims asserted against municipal officials as duplicative of the claims asserted against the municipality directly).  Accordingly,

IT IS ORDERED that the Livingston County Defendants' motion for summary judgment (ECF No. 53) is granted in part and denied in part.

IT IS FURTHER ORDERED that the motion is granted as to Sheriff Murphy and Deputies Marquette, Famie, and Loar.

IT IS FURTHER ORDERED that the motion is denied as to Livingston County, Sergeant Davis, and Deputies Heiob, John, VanVleet, Schulte, Turchi, and Linden.

IT IS FURTHER ORDERED that Sheriff Murphy and Deputies Marquette, Famie, and Loar are dismissed from this case with prejudice.


Dated: March 10, 2025                    s/ Robert J. White
                                         Robert J. White
                                         United States District Judge